# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41446

TRACY SALES, individually, )
)
   Plaintiff-Appellant, )
)
v. )
)
STACIE PEABODY, individually and doing )
business under the assumed name of )
FINGERPRINTS DAY SPA, )
)
   Defendant-Respondent, )
)
and )
)
LINDA COOK, individually, )
)
   Defendant. )
_____ )

Boise, August 2014 Term

2014 Opinion No. 99

Filed: September 19, 2014

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Melissa Moody, District Judge.

The judgment of the district court is <u>vacated</u> and the case is <u>remanded</u>.

Jacobson & Jacobson, PLLC, Meridian, for appellant. James F. Jacobson argued.

Carey Perkins, LLP, Boise, for respondent. Tracy L. Wright argued.

_____

J. JONES, Justice

     Tracy Sales brought suit against spa owner Stacie Peabody, claiming that she contracted a toe infection as a result of a pedicure performed at the spa. The district court granted summary judgment against Sales after concluding that she had failed to present sufficient evidence of causation. The district court also denied Sales' motion for reconsideration based on the ground that she had not adequately alleged the theory of negligence she relied on in support of that motion. Sales timely appealed to this Court.

1

# I.
## FACTUAL AND PROCEDURAL HISTORY

At the time this litigation began, Stacie Peabody was the owner and operator of Fingerprints Day Spa in Boise, Idaho (the "Spa"). The Spa had two pedicure stations, each of which was equipped with a foot basin that was filled with warm water during the performance of a pedicure. Peabody owned these stations and the accompanying foot basins. Tracy Sales was a client of Linda Cook, a licensed nail technician, who leased space in the Spa from Peabody. Cook was not employed by Peabody or the Spa. Cook never signed a written contract detailing the terms of their agreement and was required to use her own supplies and nail implements when providing services. Cook shared the two foot basins with other lessees and with Peabody, who also performed pedicures. Cook testified it was her understanding that Peabody was responsible for cleaning and maintaining the foot basins, but that she cleaned the basin she used. Peabody testified that she was responsible for cleaning and sanitation when she used the pedicure stations for her personal clients.

During a visit to the Spa on April 19, 2010, Sales received what she described as a puncture wound in her right big toe. Sales testified that "after [the pedicure] there was a little bit of redness. But never any blood." She stated that during the pedicure she "did not experience pain. There was one point where there was—well, yes, I did at one brief point. Very quick." According to Sales, the pain did not continue throughout the pedicure. Rather, "it was just real brief." Sales did not remember whether she felt pain in her toe that evening, but "[t]he next day it was sensitive, and red, and puffing up." Within a short period of time, Sales said, the pain, redness, and swollenness dissipated. And then "[s]ometime during the summer" her pain returned "in a totally different aspect." Sales further testified that five months after the pedicure, her toe was in pain, and that by October, it was "extremely painful and had been swollen about three times the size of [her] normal toe." Sales first sought medical treatment for her toe on October 11, 2010.

Sales went to podiatrist Jeffrey L. Chandler on December 27, 2010. Dr. Chandler initially thought that Sales may have an ingrown toe nail stemming from the pedicure and decided to perform an excision of the toe. On January 17, 2011, Sales returned with inflammation and Dr. Chandler decided to open the joint, clean it out, and perform a culture, which "appeared to be clean." He began suspecting a "psoriatic arthritic joint." When Sales returned on February 28,

2

Dr. Chandler "decided to look for mycobacteria." He performed a biopsy on March 14 and the results "indicated there was no fungus or yeast isolated." In his medical report prepared for this litigation he said, "as this continued to be on going and no other lesions or psoriatic joint processes in any other place in her body except where the toe had been worked on by this salon in April of 2010, we determined that it was a mycobacterial infection that was a result from the incident Tracy Sales had at the Salon."

On April 10, 2012, Sales filed suit against both Stacie Peabody d/b/a/ Fingerprints Day Spa and Linda Cook. She alleged two causes of action: negligence against both Peabody and Cook and *respondeat superior*—that Cook's negligence was attributable to Peabody. Sales alleged that during the pedicure, her

> right big toe was punctured or otherwise injured by an instrument or instruments being used to perform the pedicure. . . . Later, the cuticle and skin around the toe nail became red and swollen. Infection set in and Plaintiff's condition worsened, resulting in significant injury to Plaintiff, and Plaintiff required numerous treatments and procedures, including surgery.

Peabody moved for summary judgment on the *respondeat superior* claim in April of 2013. In response, Sales filed the affidavit of Dr. Chandler ("First Affidavit") in which he stated that Sales got a mycobacterial infection as a result of the pedicure performed by Cook. On May 30, 2013, the district court granted summary judgment to Peabody on the *respondeat superior* claim. That order is not challenged on appeal.

The following month, Peabody filed a second motion for summary judgment, this time on the negligence claim. Peabody argued that Sales could not establish either duty or causation. In response, Sales asserted that she contracted the mycobacterial infection as a result of Peabody's negligence in failing to properly clean, maintain, sanitize, and disinfect her facility, including the pedicure stations and foot basins. The district court granted Peabody's motion, holding that Sales had failed to put forth any evidence that Peabody's alleged breach of duty caused the injury ("Summary Judgment Order"). The court said, "Dr. Chandler does not state that a dirty foot basin caused—or even contributed to—Plaintiff's injury." As an alternate basis for granting summary judgment, the district court ruled that, even if there was evidence of causation, the puncture wound caused by Cook was a superseding cause.

Sales filed a motion to reconsider, along with a second affidavit of Dr. Chandler ("Second Affidavit"). In his Second Affidavit, Dr. Chandler stated his opinion that Sales had

suffered the toe infection as a result of "the presence of mycobacteria in the foot basin in which Tracy Sales received the pedicure at the Salon." He asserted that Sales' "toe would have been infected with the mycobacterial (sic) at that time regardless of whether a prick, a poke or a movement of the cuticle occurred."

The district court denied the motion to reconsider, noting that Dr. Chandler's Second Affidavit contained "some evidence" that Peabody's alleged failure to clean the foot basin caused Sales' injury but that this had not been alleged as a ground of negligence in the complaint. ("Reconsideration Order"). Sales filed a timely appeal.

## II.
## ISSUES ON APPEAL

1. Whether the district court erred in denying Sales' motion to reconsider.
2. Whether other grounds support the judgment against Sales.

## III.
## ANALYSIS

### A. Standard of review.

The appropriate standard of review is well-settled:

> "Appellate review of a district court's ruling on a motion for summary judgment is the same as that required of the district judge when ruling on the motion." *Steele v. Spokesman–Review*, 138 Idaho 249, 251, 61 P.3d 606, 608 (2002). Under I.R.C.P. 56(c), summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). This Court must "liberally construe . . . the record in favor of the party opposing the motion and draw . . . all reasonable inferences and conclusions in that party's favor." Steele, 138 Idaho at 251, 61 P.3d at 608. Summary judgment is not appropriate "[i]f the evidence is conflicting on material issues, or if reasonable minds could reach different conclusions." *Peterson v. Romine*, 131 Idaho 537, 540, 960 P.2d 1266, 1269 (1998).

*Liberty Northwest Ins. Co. v. Spudnik Equip. Co., LLC*, 155 Idaho 730, 732–33, 316 P.3d 646, 648–49 (2013). The standard of review applicable when reviewing a district court's denial of a motion to reconsider has recently been clarified. "[W]hen the district court grants summary judgment and then denies a motion for reconsideration, 'this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment.' This means the Court reviews the district court's denial of a motion for reconsideration de novo." *Bremer, LLC*

4

*v. E. Greenacres Irrigation Dist.*, 155 Idaho 736, 744, 316 P.3d 652, 660 (2013) (quoting *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012)).

**B. The district court erred in denying the motion to reconsider based on an inadequate pleading.**

Sales asserts that it was error for the district court to deny her motion to reconsider based on a failure to adequately plead the appropriate theory of negligence—an issue which the district court raised *sua sponte*. In the alternative, Sales contends that her complaint includes an appropriately pleaded negligence claim. Peabody counters that it "would have been improper for the district court to have considered new theories raised for the first time" in Sales' motion to reconsider. In support of this contention, Peabody cites to theories of judicial estoppel and invited error—neither of which were theories that the district court utilized in its analysis.

In its Reconsideration Order, the district court stated:

> Considering Dr. Chandler's most recent affidavit, Plaintiff has now submitted **some evidence** that Defendant Peabody's alleged failure to clean the foot basin caused Plaintiff's injury . . . . In other words, there is now—arguably at least—a genuine issue of material fact on each element of negligence against Defendant Peabody for failing to clean the foot basin.
>
> The difficulty for the Court is that the tort Plaintiff has now supported with enough evidence to survive summary judgment is not the same tort pled in the Complaint. In her Complaint, Plaintiff alleged a puncture and injury. Plaintiff now alleges a dirty foot basin and injury. . . .
>
> Repeated readings of the entire Complaint do not reveal the particular tort (dirty foot basin, mycobacterial infection, and injury) that Plaintiff now asserts. Because a cause of action not raised in a party's pleadings cannot be considered on summary judgment, *Edmondson v. Shearer Lumber Products*, 139 Idaho 172, 178, 75 P.3d 733, 739 (2003), it would be improper for this Court to deny summary judgment to Defendants based on a theory of negligence raised for the first time in an affidavit in support of a motion to reconsider. Accordingly, Plaintiff's motion to reconsider granting summary judgment is denied.

(emphasis in original)

The Court recently addressed this precise scenario in *Massey v. ConAgra Foods, Inc.*, 156 Idaho 476, 328 P.2d 456 (2014). There, we held that "a district court's *sua sponte* dismissal of a claim based on an insufficient pleading is in error when neither party raised the issue and no opportunity was given to argue that, in fact, the claim was sufficiently pleaded." *Id*. at 483, 328 P.3d at 463. Also in *Massey*, we reaffirmed that the pleading standard under I.R.C.P. 8(a) is not an onerous obstacle to overcome. *Id*. It is well-established that "[a] complaint need only contain

a concise statement of the facts constituting the cause of action and a demand for relief." *Clark v. Olsen*, 110 Idaho 323, 325, 715 P.2d 993, 995 (1986). "The purpose of a complaint is to inform the defendant of the material facts upon which the plaintiff bases his action." *Id*.

The district court erred in denying Sales' motion to reconsider on the ground stated. In her complaint, Sales alleged:

### COUNT I - NEGLIGENCE

> Defendants . . . were negligent in causing injury and damage to Plaintiff as a result of the performance of the pedicure; in failing to warn Plaintiff of potential risks involved in the pedicure procedure and in failing to keep tools and instruments in a safe and usable condition to avoid injury or infection to Plaintiff and others for whom they performed pedicure procedures; and otherwise failing to maintain the premises, facility, equipment, and working conditions in a safe and reasonably prudent manner to avoid injury or infection to Plaintiff and others for whom they performed pedicure procedures.

This allegation informed Peabody that Sales was pursuing a negligence claim against her and Cook based on an alleged failure to maintain the premises, equipment and instruments in a safe condition to avoid infection to her and other customers. This is the type of short and plain statement of the facts that is required under I.R.C.P. 8(a)(1).

The district court and the parties were aware, during the proceedings on the second motion for summary judgment—the negligence claim—that Sales contended Peabody was liable for negligence in failing to properly clean the foot basin. Peabody recognized that Sales was contending her injury resulted from Peabody's failure to maintain the cleanliness of the foot basin. In Peabody's memorandum supporting her second summary judgment motion on the issue of negligence, she stated:

> The relevant questions in this matter are: (1) did Ms. Peabody have any duty to clean the foot basin prior to the subject pedicure; (2) is there evidence that Ms. Peabody breached any duty to clean the foot basin; and, (3) is there evidence of a causal link between any failure to clean the foot basin and Plaintiff's alleged injury.

Peabody's memorandum then devoted 3½ pages to addressing these three questions. It cannot be said that Peabody was not on notice of Sales' dirty foot basin negligence claim.

In its Summary Judgment Order, the district court noted that "Plaintiff alleges that her foot became infected because the punctured foot was exposed to bacteria from a dirty foot basin." The court continued, "[i]f the jury found that Stacie Peabody had a duty to keep the foot basin clean, Peabody's alleged failure to do this is a question of fact for the jury." The court

6

acknowledged "Plaintiff's argument that 'Dr. Chandler's opinion is that Plaintiff's injuries were the result of a mycobacterial (infection) that she contracted while her feet were in Defendant's foot basin. The presence of the mycobacteria in the foot basin caused Plaintiff's injury.'"

It is true that the proceedings on the second summary judgment focused both on the allegation of a punctured toe and the allegation of a dirty basin, but Dr. Chandler's Second Affidavit, submitted in support of the motion to reconsider, clarified that the infection would have resulted even if there had been no puncture. According to Dr. Chandler:

> Whether Tracy Sales received a prick, a poke, or a movement of her cuticle at or around the same time [as the pedicure] is not material to my medical opinion. Tracy Sales (sic) toe would have been infected with the mycobacterial (sic) at that time regardless of whether a prick, a poke, or a movement of the cuticle occurred.

Dr. Chandler opined, in essence, that Sales could have contracted the mycobacteria infection from a dirty foot basin, regardless of whether the toe was punctured.

Sales' complaint was adequate to encompass a claim that her injury resulted from Peabody's failure to properly "maintain the . . . equipment . . . in a safe and reasonably prudent manner to avoid injury or infection to Plaintiff." The district court erred in denying Sales' motion for reconsideration.

## C. The judgment cannot be sustained on other grounds.

Although Peabody did not file a cross-appeal, she contends that the judgment dismissing the negligence claim against her can be sustained on at least three other grounds: (1) the actions of Linda Cook constituted an intervening, superseding cause of Sales' injuries, (2) Dr. Chandler's affidavits "are inadmissible as evidence in opposition to summary judgment," and (3) Sales failed to provide any competent evidence to establish that Peabody owed a duty to clean and sanitize equipment used by her lessees. These assertions will be dealt with in turn.

In its Summary Judgment Order, the district court granted summary judgment to Peabody on the alternate ground that "the puncture allegedly inflicted by Linda Cook is a superseding cause of any resulting injury to Plaintiff's foot." The court explained:

> Construing all the facts in the light more favorable to the Plaintiff, indeed, exactly as Plaintiff has pled in her case—Cook punctured Plaintiff's foot during a pedicure and Plaintiff's foot became infected. Plaintiff's infection resulted from the puncture and simultaneous exposure to the bacteria-rich environment of a dirty foot basin. As a matter of law, however, the (alleged) dirty foot basin did not cause Plaintiff's injury because the puncture was a superseding cause of any resulting injury.

7

It is not clear how the intervening, superseding cause theory made its way into the proceedings on Peabody's second motion for summary judgment. The theory does not appear in Peabody's memorandum supporting her motion for summary judgment on the negligence issue. The district court appears to have raised the issue *sua sponte* during the argument on the second summary judgment motion. The district court may not grant summary judgment on a ground raised *sua sponte*. *Thomson v. Idaho Ins. Agency, Inc.*, 126 Idaho 527, 531, 887 P.2d 1034, 1038 (1994).

Furthermore, the district court's holding that Linda Cook's alleged puncture of Sales' toe was a superseding event was based on a finding that "[t]here is no evidence in the record that Plaintiff contracted an infection from putting her intact foot in a dirty basin." However, in the district court's subsequent Reconsideration Order, the court noted that Dr. Chandler's Second Affidavit constituted "some evidence" in this regard. And, in any event, the record presents a chicken and egg quandary. It is not clear whether the alleged prick of the toe occurred before, during or after Sales submerged her toe in the foot basin. Therefore, for several reasons, the judgment cannot be sustained on the intervening, superseding cause theory.

Peabody next asserts that "the Chandler materials are conclusory, speculative, and not based on personal knowledge of the affiant. Therefore, those materials are inadmissible as evidence in opposition to summary judgment . . . ." Presumably, the "Chandler materials" refer to both of Dr. Chandler's affidavits. Peabody's problem is that the district court appears to have admitted both affidavits into evidence because it clearly considered both of them in its orders. In its Reconsideration Order, the court, in considering Dr. Chandler's Second Affidavit, stated that "Plaintiff has now submitted **some evidence** that Defendant Peabody's alleged failure to clean the foot basin caused Plaintiff's injury, and further, that this alleged failure to clean the foot basin was the sole cause of Plaintiff's injury, completely separate from any puncture." Peabody did not move to strike either of Dr. Chandler's affidavits, although she did state in her memorandum opposing Sales' motion to reconsider that Dr. Chandler's opinions "remains speculative and conclusory, and therefore do not constitute admissible evidence."

At the hearing on Peabody's first motion for summary judgment on the *respondeat superior* claim, Peabody verbally objected to Dr. Chandler's First Affidavit, as well as the affidavit of Doug Schoon, Sales' nail care expert. The district court stated: "I will deny, recognizing the objection that there's no formal motion to strike—I will deny the verbal motion to strike. . . . And I will consider those [affidavits] in opposition to the defendant's motion for

summary judgment." In the proceedings on the second motion for summary judgment on the issue of negligence, Peabody filed a written motion to strike the affidavit of Doug Schoon, which the district court denied, but at no time during the proceedings did Peabody assert that Dr. Chandler's First Affidavit was inadmissible.

In *Hecla Mining Co. v. Star-Morning Mining Co.*, 122 Idaho 778, 839 P.2d 1192 (1992), "this Court held that oral objection at a summary judgment hearing was sufficient to preserve the right to challenge the admission of evidence in an affidavit on appeal even though that party did not submit a written pre-hearing motion to strike." *Gem State Ins. Co. v. Hutchison*, 145 Idaho 10, 15, 175 P.3d 172, 177 (2007). Apparently, "there is 'no authority in this state that requires a motion to strike[;]' instead, "only 'some form of objection is ordinarily necessary' to 'preserve the right to challenge on appeal the admission or consideration of evidence.'" *Id.* (quoting *Hecla*, 122 Idaho at 782–83, 839 P.2 1196–97.) Furthermore, a "trial court's failure to rule on [a] motion to strike amounts to a denial of that motion[,]" so it follows that a trial court's consideration of an affidavit, without explicitly ruling on its admissibility, likewise constitutes a denial of any objection to its admission. *Ball v. City of Blackfoot*, 152 Idaho 673, 677, 273 P.3d 1266, 1270 (2012). "The trial court has discretion to decide the admissibility of expert testimony, and on appeal this decision will not be overturned absent an abuse of discretion." *Clair v. Clair*, 153 Idaho 278, 290, 281 P.3d 115, 127 (2012).

The district court clearly considered both of Dr. Chandler's affidavits, even though it did not explicitly rule on their admissibility. Thus, Peabody was required to challenge the admission of the affidavits on appeal and demonstrate that the district court abused its discretion in implicitedly admitting the same into evidence. She has done neither and cannot now complain about the matter on appeal.

Peabody argues next that "there is no basis in law for imposing upon Ms. Peabody any duty to clean the equipment used by her lessees in conjunction with their own customers [and that] Plaintiff's failure to establish any duty running from Ms. Peabody to Plaintiff under the circumstances of this case provides alternative grounds on which the district court's decision may be affirmed." Sales responds that this argument should not be considered by the Court because "Defendant has not cross-appealed," and Peabody's arguments "were briefed and addressed at the district court and found to be without merit."

9

The district court determined in its Summary Judgment Order that Peabody as owner of the Spa premises, owed business invitees, such as Sales, a duty of ordinary care. The court indicated that whether such duty required Peabody to clean Cook's foot basin for Cook's clients was a question of fact for the jury.[1] Sales argues that Peabody's duty is rooted in administrative rules adopted by the Idaho Board of Cosmetology pursuant to Idaho Code section 54-821 and IDAPA 24.04.01.000. "[I]n Idaho, it is well established that statutes and administrative regulations may define the applicable standard of care owed . . ." *O'Guin v. Bingham Co.*, 142 Idaho 49, 52, 122 P.3d 308, 311 (2005). "A court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation." *Id.*

The owner of a cosmetology establishment, such as the Spa, is responsible for any violation of regulations that occurs in "'common areas' such as shampoo bowls" that are for joint use in the licensed premises. IDAPA 24.04.01.300.02 and 03(c). This would include foot basins in the Spa, which were jointly used by Peabody, Sales, and other licensed nail technicians. Cosmetology shops, such as the Spa, "must be under the direct supervision of a licensed operator." IDAPA 24.04.01.800.12. All shops "must be maintained in an orderly manner . . . so as to be safe and comfortable to the operators and patrons." IDAPA 24.04.01.800.01. Furthermore, "[e]very precaution shall be taken by persons licensed pursuant to [the cosmetician licensing statutes in Chapter 8, Title 54, Idaho Code] to prevent the transfer of disease causing pathogens from person to person." I.C. § 54-824A(3). The statute and regulations are sufficient to place a duty on the holder of a primary establishment license, such as Peabody, to maintain jointly used facilities, such as the foot basins, in a clean and sanitary condition to safeguard patrons against infections.

Because we find no merit in the additional grounds asserted by Peabody in support of the district court's judgment and because the district court erred in denying Sales' motion to reconsider, we vacate the judgment. This is not to say that Sales has presented more than a marginal showing on the issue of causation. Because the district court determined in its Reconsideration Order that with Dr. Chandler's Second Affidavit "Plaintiff has now supported

---

[1] "In negligence actions, the determination of whether there is a duty is a question of law to be decided by the court." *Bramwell v. South Rigby Canal Co.*, 136 Idaho 648, 650, 39 P.3d 588, 590 (2001).

[her negligence claim] with enough evidence to survive summary judgment," we are disinclined to find otherwise on appeal.[2]

### IV.
### CONCLUSION

The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion. Costs on appeal are awarded to Sales.


Chief Justice BURDICK, and Justice EISMANN and Justice Pro Tem WALTERS CONCUR.


HORTON, J., concurring.

I concur in the Court's decision. I think it is important to emphasize that the district court is not foreclosed from considering the admissibility of Dr. Chandler's affidavits on remand. Our reversal does not mean that the district court's implicit determination that Dr. Chandler's affidavits were admissible somehow becomes law of the case and immune from subsequent challenge, whether by way of a motion to strike (the preferred method) or some other form of objection to the district court's consideration of the evidence. This is important because Dr. Chandler's opinion as to causation is patently inadmissible.

---

[2] It is not at all clear what evidence the district court was considering in making this statement. The Second Affidavit of Dr. Chandler, by itself, is insufficient to establish causation. He simply assumes the presence of mycobacteria in the foot basin at the time of the pedicure. It may be that the district court was taking into account testimony in affidavits and depositions discussed during the hearing on the first motion for summary judgment. In her deposition, Peabody testified that she took no efforts to sanitize tools or equipment at the Spa other than that which she used for her clients and that she had no idea "[w]hat the other girls do when they do their services." Sales' nail care expert, Schoon, opined that "Peabody did not properly clean and disinfect her pedicure tub unit. Improper cleaning and disinfection of such units is a leading cause of leg/foot related infections in nail establishments and her failure to do so significantly increase[d] the potential for clients to develop directly related skin infections due to microbial cross-contamination." During the hearing on the first summary judgment motion, Peabody's counsel conceded that, "[i]f we accept as true that it was Ms. Peabody's duty to clean the foot basin for Ms. Cook, then the plaintiff might be able to satisfy [the burden of establishing a direct negligence claim] by showing the foot basin was unclean." The district court later noted that Dr. Chandler's First Affidavit and Schoon's affidavit "contain information which directly contradicts" Peabody's contention that there was no evidence supporting the conclusion that the foot basin was not properly cleaned. Even though it is likely the district court had this testimony in mind in making the determination that Sales had supported her negligence claim with enough evidence to survive summary judgment, there are still some troublesome gaps in the showing of causation. If Peabody's failure to sanitize the foot basins when others were using them might result in infection, was mycobacteria one such infection? Is it reasonable that a mycobacterial infection would first manifest itself five months after a pedicure? These and other possible issues regarding causation can be addressed in further pretrial proceedings on remand.

Dr. Chandler's first affidavit incorporated an opinion letter dated May 8, 2013. That letter outlined the course of his treatment of Sales' toe. Dr. Chandler stated that "we determined that it was a mycobacterial infection that was a result from the incident Tracy Sales had at the Salon." Dr. Chandler's second affidavit explained: "By use of the word 'incident,' I was referring to the presence of mycobacteria in the foot basin in which Tracy Sales received the pedicure at the Salon." He then explained that the simple exposure to mycobacteria would have resulted in infection, regardless of whether there was some traumatic event in the course of the pedicure: "Tracy Sales['] toe would have been infected with the mycobacterial [sic] at that time regardless of whether a prick, a poke, or a movement of the cuticle occurred."

Dr. Chandler reiterated his view of causation in slightly different terms in the first affidavit, stating: "there is a causal relationship between the injuries Ms. Sales sustained and the treatment she received as a result to the incident at the salon in April 2010." Dr. Chandler's second affidavit then explained this statement, stating "my use of the word 'treatment' … refers to the placement of Tracy Sales' feet in the foot basin at the Salon, where her toe became infected with a [sic] mycobacteria." Dr. Chandler then explained that he held these opinions to a reasonable degree of medical probability.

This presents the critical question: what evidence is there that mycobacteria were present in the basin at the time of the pedicure? There is no direct evidence, in the form of test results or otherwise, that mycobacteria were present in the basin when Sales received the pedicure. Rather, it appears from the definitions that he utilized, that Dr. Chandler held the opinion that mycobacteria were present in the basin at the time of the pedicure. There are only two data points that can be discerned from his affidavits that support this opinion based upon inference: (1) Dr. Chandler's diagnosis of a mycobacterial infection in Sales' toe; and (2) Sales' medical history, in which she "stated she had a pedicure in April 2010 and 'it has gone downhill from there.' "

The lesser problem with reliance on the second datum point is that Dr. Chandler either took an incomplete history as to Sales' symptoms or elected to ignore the history when he focused on her report that her toe had "gone downhill" following the pedicure. Although she reported that the day after the pedicure, the toe was "sensitive, and red, and puffing up" these symptoms quickly disappeared. It was only some months later that she began to experience pain "in a totally different aspect." Thus, although Sales experienced initial inflammation in the toe following the pedicure, this symptomology resolved for a period of some months before her

12

more serious symptoms emerged. Given that the sole connection that he identified between the infection and the pedicure was Sales' description of her symptoms, Dr. Chandler's failure to address the significant period when Sales was asymptomatic raises significant questions as to the reliability of his inference that the basin was infected with mycobacteria.

The greater problem that I have with Dr. Chandler's opinion is the methodology upon which his opinion is based. This Court, until recently, rejected mere temporal coincidence as a basis for expert opinion testimony as to causation.[3] *Coombs v. Curnow*, 148 Idaho 129, 141, 219 P.3d 453, 465 (2009); *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007); *Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 594–95, 67 P.3d 68, 73–74 (2003). However, this Court recently adopted a more expansive view of the admissibility of expert testimony as to causation in *Nield v. Pocatello Health Servs., Inc.*, No. 38823, 2014 WL 1258268 (Feb. 14, 2014).

I raise the decision in *Nield*, not because I wish to rekindle disharmony among the members of this Court, but rather because I am concerned that the district court may view itself as constrained by that decision to hold that Dr. Chandler's opinions are admissible. In *Nield*, this Court held that the district court erred when it determined that the expert opinion testimony regarding causation proffered by the plaintiff was inadmissible. *Id.* at \*16. This Court did so, despite the dissenting justices' views that the opinions were "based upon the temporal

---

[3] This rule applies to expert testimony. It does not apply when lay opinion would be admissible, i.e., when:

> such causation is within the usual and ordinary experience of the average person, and also satisfies I.R.E. 701. For example, if a person fell down some steps, landing on a knee, and immediately thereafter felt pain in the knee, saw an open wound on the knee, and within minutes or hours observed that the knee was swelling, that lay person could provide reliable testimony that the pain, wound and swelling were caused by the fall.

*Dodge-Farrar v. Am. Cleaning Servs. Co.*, 137 Idaho 838, 842, 54 P.3d 954, 958 (Ct. App. 2002). However, as the Court of Appeals cautioned:

> As the claimed symptoms and treatment become more separated in time from the fall, however, the causal relationship becomes more doubtful and tenuous, and expert testimony becomes necessary to establish causation. As time passes, the possibility that prior or subsequent injuries or unrelated disease processes may play a causal role makes lay opinion unreliable and inadequate to sustain a claim.

*Id.* at 842–43, 54 P.3d at 958–59. The passage of time and resolution of Sales' symptoms in this case clearly foreclose the admissibility of a lay opinion that the infection was caused by the immersion of her foot in the basin or that the water in the basin contained mycobacteria.

13

relationship between Ms. Nield's admission to PCRC and the onset of her infection." *Id*. at *21. (Eismann, J., dissenting).

The central dispute between the majority and the dissent in *Nield* was the significance of our holding in *Weeks* and that decision's reliance on a federal case, *Clausen v. M/V New Carissa,* 339 F.3d 1049 (9th Cir. 2003). The majority clearly rejected a line of authority from the federal courts regarding expert opinions of causation, stating "Being the highest court of a sovereign state, we are free to adopt our own concept of differential diagnosis and we decline to follow the more expansive definition employed by some federal courts." *Nield*, at *8. The majority continued: "[T]he district court erred here in holding that expert medical testimony was required in order to establish how and where Nield was infected. This Court's concept of the differential diagnosis methodology does not require such a holding." *Id*. at *11.

These statements were made in evident response to the dissent's view that:

the rule regarding differential diagnosis adopted in *Weeks* was not simply to diagnose what medical condition was causing the patient's symptoms. It was, as in *Clausen,* to determine the reliability and admissibility of an expert's opinion on the issue of proximate cause in a negligence action. In fact, in *Clausen* it was used to determine the reliability and admissibility of an expert's opinion as to the proximate cause of an infection, which is precisely the issue to which the district court utilized differential diagnosis in this case.

*Id*. at *28 (Eismann, J., dissenting).

However, I do not believe that the decision in *Nield* controls the district court's decision as to the admissibility of Dr. Chandler's decision on remand. In *Nield*, the majority quoted from the affidavit of the plaintiff's expert physician, who in turn quoted a letter from the Idaho Department of Health and Welfare directed to the defendant: " 'There were four or five other residents in rooms near the identified resident with methicillin resistant staphylococcus aureus infections.' The findings of the investigation confirmed and substantiated poor infection control measures by the staff. *Id*. at *5. In short, in *Nield*, there was an abundance of evidence as to the defendant's poor infection control measures and at least a modicum of evidence that would support an inference that the plaintiff had been exposed to the organism that led to her infection. Thus, the majority held that Nield had presented sufficient evidence to support a finding of the existence of a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *Id*. at *10 (quoting *Sheridan v. St. Luke's Regional Medical*

14

*Center*, 135 Idaho 775, 785, 25 P.3d 88, 98 (2001)). Based upon this conclusion, the majority held that no expert testimony was required.

Unlike *Nield*, on the record presently before this Court, there is simply no evidence giving rise to a reasonable inference that mycobacteria were present in the basin at the time of the pedicure. Thus, unless Sales can adduce additional evidence that would support an inference of mycobacterial presence in the basin, the district court would be wholly justified in striking Dr. Chandler's affidavit for want of foundation and dismissing this action.